662 F.2d 79
 213 U.S.App.D.C. 234, 82-1 USTC P 9261
 Walter D. TEAGUE, III, Indochina Solidarity Committee, on
behalf of themselves and all those individuals and
organizations similarly situated, Appellants,
v.
Donald C. ALEXANDER, et al.
 No. 79-2551.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 15, 1981.
Decided Aug. 24, 1981.
 
 Appeal from the United States District Court for the District of Columbia (D.C.Civil Action No. 75-0416).
 Alan H. Levine, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom David Landau and Leon Friedman, New York City, were on the brief, for appellants.
 Thomas M. Preston, Atty., U. S. Dept. of Justice, of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of court, with whom M. Carr Ferguson, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., and Michael L. Paup, Atty., U. S. Dept. of Justice, Washington, D. C., were on the brief, for appellees.
 Before McGOWAN and TAMM, Circuit Judges, and HOWARD T. MARKEY,* Chief Judge, United States Court of Customs and Patent Appeals.
 Opinion filed by Chief Judge MARKEY.
 Separate concurring opinion filed by Circuit Judge McGOWAN.
 Separate opinion concurring in the result filed by Circuit Judge TAMM.
 MARKEY, Chief Judge:
 
 
 1
 Walter D. Teague, III (Teague), appeals from an Order of the United States District Court for the District of Columbia granting summary judgment to Alexander, et al. (Alexander). We affirm.
 
 Background
 
 2
 Teague and the Indochina Solidarity Committee[1] sued for damages and equitable relief against 32 former and present federal officials associated with the Internal Revenue Service (IRS), the White House, the Federal Bureau of Investigation (FBI), the Department of Justice, the Air Force, and the Army. Teague identified his suit as a class action under Fed.R.Civ.P. 23(a), 23(b) (2), and 23(c)(4), asserting his representation of 8585 individuals subjected to special tax enforcement procedures because of political beliefs and activities.
 
 
 3
 The Activist Organization Committee (AOC)[2], an internal unit of the IRS, was formed in July 1969. The AOC had its genesis in indications that individuals and organizations were violating the Internal Revenue laws by: (1) refusing to pay taxes, as a protest to the Vietnam war; (2) transporting, selling and using firearms and explosives; (3) violating statutes relating to the tax-exempt status of organizations; (4) failing to file gift tax returns for large contributions; and (5) other actions.
 
 
 4
 The AOC's described purpose was to "coordinate activities in all Compliance Divisions involving ideological, militant, subversive, radical, and similar type organizations; to collect basic intelligence data; and to insure that the requirements of the Internal Revenue Code concerning such organizations have been complied with."[3]
 
 
 5
 The AOC gathered information on activist organizations and persons prominently identified with them. Although information was gathered from many sources, the greater portion was provided by the FBI.
 
 
 6
 On receipt of information on an organization or individual, the AOC would open a file. When it disbanded in 1973, the AOC had 11,458 files on 8,585 individuals and 2,873 organizations. Approximately 41 percent of the files were on black and ethnic organizations viewed as associated with violence, confrontations and civil disturbances, 15 percent pertained to white organizations considered "right-wing extremist" and "racist," 18 percent on antiwar organizations and individuals, and 11 percent on groups and individuals described as "new left" radical. Joint Committee Report, supra, note 3, at 45.
 
 
 7
 In August or September 1969, following its standard procedure on receipt of information regarding his antiwar activities, the AOC established a file on Teague. His file was among those selected on a random basis to determine whether he had filed tax returns. When the IRS master file computer indicated that Teague had not filed tax returns for any year except 1968, the AOC referred the matter to the IRS's Manhattan District Director.
 
 
 8
 In February 1971, the referral was assigned to the Collection Division of the Manhattan District Office. In February 1972, the Collection Division transferred the matter to the Audit Division. A transcript of Teague's tax return records from 1961 through 1970 indicated that he had filed tax returns only in 1965 and 1968. Based on that information, and records obtained from the Social Security Administration of Teague's income, the IRS sent Teague a "30-day letter" informing him of a proposed deficiency assessment based upon his income in 1961 and 1962 and advising him of his right to an appellate conference. Twelve days later IRS received a letter from Teague requesting an appellate conference and including copies of Teague's tax returns for 1961 and 1962. An appellate conference was held in November 1973, during which Teague produced a check dated April 15, 1963 in the amount of the tax indicated as due on his 1962 tax return. Two weeks after the appellate conference, the Manhattan Director told Teague it was closing its file on the matter.
 
 
 9
 On March 25, 1975, Teague filed this suit, alleging that defendants had violated his rights under the First, Fourth, Fifth and Ninth Amendments and had conspired to deprive him of his civil rights in violation of 42 U.S.C. § 1985(3). Teague asked for declaratory and injunctive relief and for total compensatory damages of $15,000, along with punitive damages of $20,000, against each defendant.
 
 
 10
 The district court denied Teague's motion for class action certification, denied Teague's motion for summary judgment against four defendants, and granted the defendants' motion for summary judgment.
 
 Issue
 
 11
 The issue presented is whether the district court properly granted summary judgment for the defendants.[4]
 
 OPINION
 
 12
 Teague argues that his selection for audit was directly related to and resulted from his dissident political beliefs, and that his selection on that basis violated his right to equal protection of the law and his right to speak freely. In his brief he contends that the formation and operation of the AOC was not supported by a governmental interest sufficient to justify infringement of his rights.
 
 
 13
 When asked at oral argument to define an injury Teague had suffered, his counsel said the injury resided in the expense and inconvenience of preparing for the appellate conference.
 
 
 14
 To invoke the judicial power in a challenge to the validity of an administrative action, a party must show "that he has sustained a direct injury resulting from an unlawful governmental action." Laird v. Tatum, 408 U.S. 1, 13, 92 S.Ct. 2318, 2325, 33 L.Ed.2d 154 (1971); Ex parte Levitt, 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937); Finley v. Hampton, 473 F.2d 180, 185 (D.C.Cir.1972). Any monetary injury suffered here by Teague is de minimis and cannot therefore warrant legal cognizance. The time and expense of preparing for an appellate conference on one's taxes, if a burden at all, is one placed annually on many citizens. It is part of the price necessitated by a tax system dependent largely upon the honesty and cooperation of citizens.
 
 
 15
 Though a total absence of legally cognizable injury is sufficient in this case to sustain the grant of summary judgment below, Teague's constitutional arguments raise issues warranting disposition, for "(w)e cannot sustain an intrusion on First Amendment rights on the ground that the intrusion is only a minor one." Lamont v. Postmaster General, 381 U.S. 301, 309, 85 S.Ct. 1493, 1497, 14 L.Ed.2d 398 (1965) (Justice Brennan, concurring). In the present case, however, there appears no connection between Teague's claimed injury and an intrusion on his constitutional rights.
 
 
 16
 Teague says he would not have been audited but for his selection by the AOC. It is apparent, however, that Teague's cause-and-effect analysis is flawed. He was audited, by a separate branch of IRS, because the records of that branch indicated he had failed to file required tax returns. The audit itself was thus justified. Similarly, if Teague's records had reflected compliance with the tax laws, there is here no evidence even remotely indicating that he would have been audited.[5]
 
 
 17
 The exercise of some selectivity in enforcement of the laws is not in itself and always a federal constitutional violation. Oyler v. Boles, 368 U.S. 448, 456, 82 S.Ct. 501, 505, 7 L.Ed.2d 446 (1962). A selection based on an unjustifiable standard, such as race, religion, or other arbitrary classification is impermissible. Id. Among such impermissible classifications are protected political activities. Cox v. Louisiana, 379 U.S. 536, 581, 85 S.Ct. 453, 470, 13 L.Ed.2d 471 (1965) (Justice Black, concurring). For the reasons outlined below, I do not, however, view the selection here as having been based on an unjustifiable standard.
 
 
 18
 Teague's argument that his selection was based solely on exercise of his first amendment rights and expression of political views, because of the interposition of the AOC, is too broad. The AOC was formed to aid the proper administration of the tax laws. Joint Comm. Report, supra, note 3 at 2-3.[6] It is a legitimate governmental interest to see that the tax laws are obeyed. Other courts have upheld selectivity in prosecutions for criminal cases, where the burden imposed was much greater than any here involved. See United States v. Catlett, 584 F.2d 864, 868 (8th Cir., 1978); United States v. Johnson, 577 F.2d 1304, 1308-09 (5th Cir. 1978); United States v. Swanson, 509 F.2d 1205, 1208-09 (8th Cir. 1975).
 
 
 19
 When, as here, governmental action is challenged on First Amendment grounds, that action requires close judicial scrutiny. Operation of the AOC, in gathering non-tax related information and in obtaining and reviewing information on groups not involved in tax resistence, exhibited less than the careful concern for First Amendment interests required of the government. I join Judge Tamm's concurring opinion elaborating on that view.
 
 
 20
 In the present case, no censorship or prior restraint of Teague's expression was attempted or resulted. No sanction, direct or indirect, was placed upon his exercise of First Amendment rights. There was here no "discriminatory denial of a tax exemption for engaging in speech." See Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). That AOC may have monitored more broadly than its tax enforcement interests warranted did not itself cause the injury claimed to have been suffered here.
 
 
 21
 Here Teague was audited because his tax records indicated a violation of the law a failure to pay his taxes not because he spoke. He suffered no legally cognizable injury and was deprived of no right or privilege, directly or indirectly, by a conspiracy or otherwise. Hence his claim under 42 U.S.C. § 1985(3) was properly dismissed.
 
 
 22
 Affirmed.
 
 
 23
 McGOWAN, Circuit Judge, concurring separately:
 
 
 24
 I concur in my colleagues' affirmance of the District Court's dismissal of this suit, but for different reasons.
 
 
 25
 The complaint in this case styled itself as "a class action for declaratory and injunctive relief, and an individual action for money damages..." JA 9. Appellant's motion to certify the case as a class action was denied, and appellant did not challenge that order in this appeal. It appears, therefore, that as to the injunctive and declaratory relief referred to in the complaint, there may be nothing presently before this court. This appears to be borne out by the fact that appellant's briefs on this appeal are concerned solely with his individual claim for money damages against only four of the defendants named in the complaint the claim that was the subject of appellant's motion for partial summary judgment (JA 57), which the District Court denied and which appellant seeks in its brief to have this court direct to be granted.
 
 
 26
 I would not, in any event, believe this case to be one justifying declaratory or injunctive relief. Those remedies are equitable in nature, and may be withheld in the discretion of the court. The activity of which appellant complains began in 1969. It was terminated by the defendant Donald Alexander shortly after he became Commissioner of Internal Revenue in 1973. There is nothing in this record that remotely suggests the possibility of its resumption in the future and, under these circumstances, no court is bound to grant equitable relief of the kind sought.
 
 
 27
 As to the appellant's individual claim for money damages against four of the defendants, there is a similarly substantial question as to whether the declaratory relief he sought by his motion for partial summary judgment is appropriate. It would seem to me that he should at least be put to his proof of alleged violations of Constitution or statute in a trial. My colleagues do not see the necessity of that a result which, in my judgment, represents no great deprivation for appellant since it is difficult for me to believe that, wholly apart from the immunity and other defenses asserted by these public servant defendants, any award of punitive damages would be supportable, and appellant's compensatory damages on this record appear to be negligible to the point of being beyond judicial cognizance.
 
 
 28
 TAMM, Circuit Judge, concurring in the result:
 
 
 29
 Like my colleagues, I would affirm the district court's grant of summary judgment for defendants.[1] I write separately, however, to stress my concern with the careless accommodation of first amendment concerns reflected in the tax enforcement program challenged here.
 
 
 30
 In 1969, as a result of perceived tax enforcement problems relating to activist organizations and individuals, see opinion (op.) at 81, Leon C. Green, then-Deputy Assistant Commissioner of Internal Revenue (Compliance), proposed the creation of a special tax enforcement unit known as the Activist Organization Committee. As conceived by Green, the Committee's members would be representatives of the IRS divisions. Its functions would be the compilation of information likely to bear on activist tax problems, the examination of that information for indications of tax violations and, where such indications were present, the referral of the matter to field staff for appropriate action. Affidavit of Leon C. Green (filed May 21, 1979) at 1-3; Joint Appendix (J.A.) at 66-67. Pursuant to this information-gathering function, Mr. Donald Bacon, then-Assistant Commissioner of Internal Revenue (Compliance), requested several agencies, including the FBI, to place the new committee on their dissemination lists. In those requests, Bacon asked for information regarding "various organizations of predominantly dissident or extremist nature and/or people prominently identified with these organizations." Memorandum of D. W. Bacon to Director of FBI (Aug. 8, 1969), J.A. at 85. No attempt was made to limit the scope of these requests, either as to the type of information received, or as to the groups about which such information was compiled.
 
 
 31
 Appellees contend that this undifferentiated selection of politically dissident groups for special IRS scrutiny infringes upon the exercise of no constitutional rights. They assert that the Committee was established "to assure that certain organizations and individuals were complying with the laws," and point out that conscious exercise of some selectivity in the IRS's enforcement of the tax laws is not in itself a constitutional violation. Brief for Appellees at 17. The courts have recognized that the broad scope of legitimate IRS concerns and the limited nature of agency resources necessitate a judicious allocation of those resources. For that reason, they have afforded the Service great latitude in selecting those targets and mechanisms which it believes will best serve its enforcement obligations.[2] Such discretion, however, is not without limitation. Selectivity is permitted only to foster needed flexibility, not to disguise unconstitutional arbitrariness.
 
 
 32
 Appellees attempt to premise the propriety of this exercise of its selectivity powers on the ground that the program was instituted in good faith to serve legitimate tax-enforcement interests, rather than to chill the exercise of first amendment rights. As support for this premise, they bring to the court's attention the "intentional and purposeful" discrimination test utilized in selective prosecution cases, and argue that appellant has failed to satisfy that test.[3] If in fact appellant had brought a selective prosecution claim, satisfaction of that standard would be a necessary predicate to a grant of relief. In an assessment of a first amendment claim, however, the "intentional and purposeful" standard is irrelevant. Traditional first amendment analysis requires a plaintiff to prove the existence of a first amendment right and a burden upon his exercise of that right; neither element requires proof of bad faith.[4]
 
 
 33
 For this reason, the absence of bad faith cannot support appellees' claim that the first amendment rights of appellant and others were not implicated by the operation of appellees' investigation. Inclusion within the relevant classification of political dissidents was determined, by definition, on the basis of the political position advocated by an individual or group in the exercise of the rights of free speech and freedom of political expression. Of course, a content-based classification is not unlawful per se. Where, however, the government chooses to focus its investigative resources upon those who oppose its policies, there is a very real danger that those resources will be used to further an improper end the chilling of that opposition's political expression.[5]
 
 
 34
 The IRS argues that its selection of dissidents was justified by its compelling interest in the enforcement of the tax laws. A compelling interest will not, however, sustain every encroachment upon first amendment rights. Rather, "(t)he gain to the subordinating interest provided by the means must outweigh the incurred loss of protected rights," Elrod v. Burns, 427 U.S. 347, 362, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1976), and that end must be furthered by "a means that is least restrictive of freedom of belief and association ...." Id. at 363, 96 S.Ct. at 2685.
 
 
 35
 The investigation challenged here reflects limited adherence to the spirit of these precepts. The IRS is authorized to investigate and enforce compliance with the tax laws. On that basis, it can claim a concededly compelling interest in "see(ing) that the tax laws are obeyed" and a more particularized interest in enforcing the proscriptions of section 501(c)(3) of the Internal Revenue Code. See op. at 83 & n.6. A program instituted to resolve special tax-enforcement problems created by activist organizations clearly seeks an objective encompassed by those interests. An appropriately limited objective is, however, only one step in the proper accommodation of first amendment interests. The means utilized to achieve that objective must be those least restrictive of the freedoms upon which they impinge. The structure of this investigation could not be so characterized. No attempt was made to restrict the range of groups monitored to those advocating tax resistance; no efforts were exerted to limit the nature of the information requested to that even arguably related to tax-enforcement concerns.[6]
 
 
 36
 Because the program's scope was not thus restrained, groups advocating other illegal activities as protest against the government, as well as those advocating tax resistance, were monitored. The IRS, however, is not authorized to investigate or prosecute nontax-related misconduct. Therefore, absent some credible evidence linking the activities of such groups to tax-enforcement problems, the IRS has no compelling interest in monitoring them.[7] Because their inclusion then serves only to create, unnecessarily, the potential for chilling protected expression, an investigation of this nature more closely resembles an impermissibly intrusive fishing expedition than a legitimately-directed law enforcement inquiry.[8]
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 293(a) (1976)
 
 
 [1]
 The Indochina Solidarity Committee (ISC) was organized by Teague. In a footnote to Teague's brief, it is announced that the ISC's claim is "withdrawn," in "the absence of any evidence that the organization was the subject of any adverse action by defendants."
 
 
 [2]
 The AOC was also known as the "Special Services Group" and the "Special Services Staff."
 
 
 [3]
 Staff of Joint Committee on Internal Revenue Taxation, 94th Cong. 1st Sess., Report on Investigation of the Special Services Staff of the Internal Revenue Service, at 15. (Comm.Print 1975) (Joint Committee Report)
 
 
 [4]
 The district court did not reach the government's jurisdiction contentions respecting sovereign and official immunity, the anti-injunction provision of the Internal Revenue Code, 26 U.S.C. § 7421, and the federal tax exception to the Declaratory Judgment Act, 28 U.S.C. § 2201. Nor do we
 
 
 [5]
 Ninety-eight per cent of the organizations and individuals in AOC's files were not audited. Joint Committee Report, supra note 3, at 75. If auditing were shown to have violated the Constitution, the rate or extent of violation would be irrelevant. On the present record, however, there is no evidence that any audit was unjustified by the applicable tax files on hand or that the IRS was launched on a campaign to chill the exercise of constitutional rights by subjecting to audit all those who exercised such rights
 
 
 [6]
 At oral argument, Teague's counsel stated that formation of the AOC did not constitute an unconstitutional act. Teague's brief emphasizes the AOC's gathering information without express limitation to groups specifically advocating non-payment of taxes. Beyond non-payment, however, IRS has an interest in, and duty to enforce, laws relating to the tax-exempt status of organizations and contributing activities of individuals, a status dependent on avoidance of "carrying on propaganda, or otherwise attempting, to influence legislation," 26 U.S.C. § 501(c)(3)
 
 
 [1]
 I agree with Judge Markey that the causal connection demonstrated here does not warrant reversal. Teague's injury was the result of two contributing factors: an improperly implemented program, see text infra, and inaccurate agency records. The relative significance of the factors depends upon the nature of the program challenged and that of the injury claimed. As that program was structured, the AOC did not itself finally determine the existence of tax violations if it found indications of such violations, the matter was forwarded to a field office for independent review and appropriate action. This separation of information-gathering and compliance functions suggests the attenuated nature between any flaws in appellees' enforcement program and the injury appellant alleges here. Moreover, Teague claims injury from the expense and inconvenience attendant a tax audit, a burden sustained annually by many taxpayers. When thus considered, I cannot find that the agency's failure to tailor its investigation was the determinative cause of this appellant's injury
 
 
 [2]
 See, e. g., United States v. Catlett, 584 F.2d 864, 868 (8th Cir. 1978) (Government policy of prosecuting persons failing to file tax returns as a protest against the Vietnam War where such protests were highly publicized, while pursuing only civil remedies against nonfiling protestors whose protests did not receive publicity, deemed to be within the permissible range of prosecutorial discretion); United States v. Swanson, 509 F.2d 1205 (8th Cir. 1975) (Project ACE, giving special priority to the prosecution of tax crimes by attorneys and certified public accountants, held not to constitute unlawful discrimination)
 
 
 [3]
 The Eighth Circuit, for example, has stated that satisfaction of the test requires the offer by appellant of prima facie evidence showing
 '(1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i. e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.'
 United States v. Swanson, 509 F.2d at 1208, quoting United States v. Berrios, 501 F.2d 1207, 1211 (2d Cir. 1974). See also United States v. Falk, 479 F.2d 616 (7th Cir. 1973) (en banc).
 
 
 [4]
 Similarly, the fact that the challenged action was well intentioned will not protect it from invalidation. Thus, a court which finds that that action was legitimately instituted to serve a compelling interest, but determines that it unduly infringes upon a protected right, will hold that action unlawful. See, e. g., Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960), in which the Court struck down a statute requiring that teachers disclose to school officials all organizations with which they had been associated over a five-year period. Although the Court found that the state had a right to investigate the competence and fitness of its teachers, "(t)he unlimited and indiscriminate sweep of the statute ... goes far beyond what might be justified in the exercise of the State's legitimate inquiry into the fitness and competency of its teachers." Id. at 490, 81 S.Ct. at 253
 
 
 [5]
 That this danger is not imaginary is made clear in this excerpt from a White House memorandum:
 Nearly 18 months ago, the President indicated a desire for IRS to move against leftist organizations taking advantage of tax shelters. I have been pressing IRS since that time to no avail.
 What we cannot do in a courtroom via criminal prosecutions to curtail the activities of some of these groups, IRS could do by administrative action. Moreover, valuable intelligence-type information could be turned up by IRS as a result of their field audits.
 Memorandum of Tom Charles Huston to H. R. Haldeman (Sept. 21, 1970); Joint Appendix (J.A.) at 27.
 
 
 [6]
 For example, the AOC received an FBI report on Teague describing his activities to protest the Vietnam War. These included participation in antiwar demonstrations, the distribution of antiwar leaflets, and a speech in which he advocated the sabotage of war machines and defection to the Viet Cong, but not tax resistance. J.A. at 90-92
 
 
 [7]
 The necessity for this type of nexus was addressed by the Supreme Court in Gibson v. Florida Legislative Investigation Comm., 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963). In that case petitioner, president of the Miami branch of the NAACP, was subjected to fine and imprisonment for refusing to produce the branch's membership records to a legislative committee investigating the infiltration of Communists into various organizations. Petitioner challenged the sentence, claiming that his first amendment right of freedom of association had been violated. In assessing the merits of this claim, the Court first noted the state's power to protect its legitimate and vital interests through legislative investigation, but noted: "The fact that the general scope of the inquiry is authorized and permissible does not compel the conclusion that the investigatory body is free to inquire into or demand all forms of information." Id. at 545, 83 S.Ct. at 893. Instead, the Court stated: "(I)t is an essential prerequisite to the validity of an investigation which intrudes into the area of constitutionally protected rights of speech, press, association and petition that the State convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest." Id. at 546, 83 S.Ct. at 893
 The Service apparently came to the realization that its program lacked such a nexus. A news release announcing the disbanding of the Special Services Staff noted that "(t)he data-gathering work of the group is presently confined to tax resistance organizations and those individuals who publicly advocate noncompliance with the tax laws," and quoted Donald Alexander, Commissioner of Internal Revenue, as stating: " 'The IRS will continue to pay close attention to tax rebels ... but political or social views, " extremist" or otherwise, are irrelevant to taxation....' " IRS News Release (IR-1323) (Aug. 9, 1973); J.A. at 49.
 
 
 [8]
 This impression is reinforced by a review of a memorandum prepared for the biennial meeting of the Regional Commissioners at Charlottesville, Virginia on November 1-2, 1972. The author of that memo explained that the Special Services Staff was created as a result of a concern that well organized protest groups were attempting "to erode, and eventually destroy, our entire tax system." J.A. at 45. For this reason, the Staff had undertaken the consolidation of data available within the IRS and other law enforcement agencies. The author contended that the data accumulated suggested two major categories of organizations and individuals likely to be violating the tax laws:
 (1) Violent Groups those who advocate and practice arson, firebombing and destruction of property; use coercive threads (sic) for funds through U.S. Postal Service; make threats against public officials; plan and organize prison riots; engage in activities involving illegal accumulation of firearms and ammunition; have been identified as planning and carrying out skyjacking; and, those who print and distribute publications advocating revolution against the government of this country. In category (2) there is ample evidence of activities involving so-called Non-Violent Groups who by alleged peaceful demonstrations oftentimes deliberately initiate violence and destruction. Included are those who publicly destroy and burn draft cards, destroy Selective Service office records, participate in an (sic) organize May Day demonstrations, organize and attend rock festivals which attract youth and narcotics ....
 J.A. at 46. This sort of vague and conclusory claim does not satisfy the nexus that the law requires.