Louis ZAINTZ, Steven Zaintz, and Gary Zaintz, Plaintiffs,

v.

CITY OF ALBUQUERQUE, and Ken Schultz, Defendants.

Civ. No. 88–1129 JP.

United States District Court, D. New Mexico.

April 20, 1990.

Elizabeth E. Simpson, Tomita and Simpson, Albuquerque, N.M., for plaintiffs.

Robert M. White, Paula I. Forney, Asst. City Atty., Albuquerque, N.M., for defendants City of Albuquerque and Ken Schultz.

Janet Clow, White, Koch, Kelly and McCarthy, P.A., Santa Fe, N.M., for City of Albuquerque (for depos. of John Maruffi).

## MEMORANDUM OPINION AND ORDER

PARKER, District Judge.

The subject of this Order is defendants' Motion For Summary Judgment filed December 6, 1989. Having considered the motion and accompanying memorandum, the statement of uncontroverted material facts and accompanying exhibits, and the plaintiffs' exhibits and responses thereto, and having consulted the applicable authorities, I find that the motion should be denied.

## I. FACTS

This case involves a dispute between plaintiffs and the City of Albuquerque (the "City") and former mayor Ken Schultz over the City's application and enforcement of a zoning ordinance that regulates public dances. Upon review of the record and pleadings, including the Pretrial Order entered by this Court on March 12, 1990, I find that the following facts are relevant to a determination of defendants' motion.

### A. *The Big Apple*

In May 1985, plaintiffs began operation of a facility for teenage dancing called the "Big Apple" at a building owned by plaintiff Louis Zaintz at 5101 McLeod N.E. in the City of Albuquerque, New Mexico. The business was operated by plaintiffs Steven and Gary Zaintz. Prior to May 1985, this building was used as a roller skating rink known as the "Skate Ranch."

Sometime between October 1985 and May 1986, plaintiffs applied for a permit to hold teenage public dances under the City's Public Dance Ordinance (the "Ordinance").[1]

---

**1.** The parties dispute the exact date and circumstances in which plaintiffs initially applied for a permit under the Ordinance. Defendants contend that plaintiffs initially applied for the permit in either October or December 1985 after the City notified them that they were operating their business in violation of the Ordinance. Plaintiffs contend that the City did not inform them they needed a permit until January 1986 but that the required forms and procedures were not yet available, and that they filed their application for the permit in May 1986. The fact that plaintiffs began operating their teen dance club without having applied for a permit and that the City informed them that a permit under the Ordinance was required is not in dispute.

Section 11–3–5 of the Ordinance requires that applicants for permits provide adequate security and parking, comply with the City Fire Code and required occupancy load,[2] possess a Health Department permit if any food or drink is to be served, observe specific hours of operation, and not be located within 300 feet of a residential area. Section 11–3–8C of the Ordinance provides that if a public dance is being held in violation of any provision of the Ordinance or without a required permit, the City can issue a cease and desist order provided the person is given notice that he may appeal. Section 11–3–8D further provides that a timely request for administrative review will suspend the City's enforcement of the cease and desist order. Plaintiffs do not dispute that their teen dance operations were subject to the requirements of the Ordinance.

In order to comply with the Ordinance, plaintiffs contracted for the required security and, on May 22, 1985, applied for and received a permit from the Health Department to operate a snack bar on the premises. Plaintiffs also entered into negotiations with the City to determine the occupancy rate (based on the number of available parking spaces) and to comply with the City Fire Code regarding the need for installation of a sprinkler system.

Although the record is somewhat unclear, plaintiffs apparently encountered difficulties in their efforts to obtain approval of an occupancy load based on the number of available parking spaces. The problem originated from the fact that plaintiffs had a limited number of available parking spaces on their own property. Through discussions with a City administrative officer, however, a regulation was adopted allowing plaintiffs to use available parking spaces from a neighboring business. Although plaintiffs contend the City changed the occupancy load on a number of occasions and at one point even limited the occupancy to an unprofitable number, the additional parking spaces ultimately allowed plaintiffs to operate their dance hall with the same occupancy load under which they had previously operated their skating rink.[3]

Plaintiffs did not, however, meet with the same success in complying with the City Fire Code. Section 10.309(c) of the Albuquerque Fire Code states that "[a]n automatic sprinkler system shall be installed in rooms primarily used for entertaining occupants who are drinking or dining...." The Fire Department found that this provision of the Fire Code applied to plaintiff's operation and that plaintiffs would therefore be required to install the sprinkler system. On July 17, 1986, plaintiffs applied for a variance from the sprinkler requirement which the City denied. Plaintiffs then appealed to the Fire Prevention Board of Appeals which denied their appeal on August 27, 1986. In denying their appeal, however, the City allowed plaintiffs eighteen months to install the sprinkler system.

Plaintiffs contend that the City, on several occasions, threatened them with closure. It is undisputed that, on May 21, 1986, the City informed plaintiffs by letter that they would have to terminate their teen dances until a permit was issued. On September 8, 1986, however, the City issued plaintiffs a permit to operate under the Ordinance.[4]

## B. *Club Rio*

Beginning in the early Summer of 1986, plaintiffs became aware that teen dances were being held at an establishment called

---

**2.** The occupancy load is the maximum number of persons permitted in a business establishment at any time. This limit is determined based on the type of business and the number of available parking spaces.

**3.** The most restrictive occupancy load plaintiffs allege the City limited them to was 350 persons, a number plaintiffs claim would not allow them to operate profitably.

**4.** The granting of this permit was specifically conditioned on plaintiff's retaining right of access to the additional parking spaces, providing adequate security, and maintaining an occupancy limit of 850 persons. The installation of the sprinkler system was not specifically included in the express conditions listed on the permit but was nevertheless required within eighteen months of the administrative appeal board's decision.

"Club Rio" located at 3301 Juan Tabo N.E. in Albuquerque.[5] This club was operated by Gary Graham. Graham had not applied for a permit under the Ordinance because he believed that Club Rio was not subject to its provisions. Graham's position was twofold.

First, Graham believed that, because Club Rio was also operating as an adult nightclub that was licensed to serve alcoholic beverages on days when teen dances were not held, his club's operations were only subject to the state law applicable to liquor establishments. At this time, the City apparently also interpreted the Ordinance as not applicable to establishments such as Club Rio that were licensed pursuant to state liquor laws. Second, Graham believed that because Club Rio had been operating teen dances prior to enactment of the Ordinance, his operations were grandfathered as a preexisting use and were therefore not subject to the Ordinance. Nevertheless, on July 25, 1986, Club Rio was informed by letter that it would be required to obtain a permit to operate as a public dance hall. In its notice, the City also indicated that Club Rio would be required to submit an application for a permit in order to allow it to remain open during the application process. At this point, the City apparently rejected Club Rio's argument that it was not exempt from the Ordinance because of the applicability of the state liquor law.

On July 31, 1986, Graham applied to the City for a permit to operate Club Rio as a public dance hall and was allowed to continue its dance hall operations pending a decision on the permit application. It is undisputed that Club Rio did not comply with the Ordinance provision requiring public dance halls to be located more than 300 feet from a residential area. It is also undisputed, however, that Club Rio's application for the permit falsely indicated that it had met this locational requirement.

Graham's application to the City for a permit under the Ordinance was followed by efforts by various City officials to effect legislation to amend the Ordinance's 300 foot locational requirement.[6] Although the parties dispute the specific timing, manner and individuals responsible for the initiative, they do agree that an Ordinance allowing public dances within 300 feet of a residence was ultimately never adopted.

After the proposed amendments to the Ordinance were not adopted, the City, on February 12, 1987, issued a cease and desist order to Club Rio for being in violation of the residential locational requirement of the Ordinance. On February 20, 1987, Club Rio exercised its right, as provided in the Ordinance, to appeal the cease and desist order.[7] On March 9, 1987, after a hearing,[8] the City Administrative Hearing Officer reversed the denial of Club Rio's permit on the grounds that the City had waived its right to enforce the Ordinance against Club Rio because of its failure to enforce the Ordinance in the past.

It is undisputed that, although the City Council favored appealing the decision of the Hearing Officer and requested the City Administration to initiate an appeal, the City Administration chose not to appeal the

---

5. It is undisputed that there were no other licensed teen dance halls operating in the City during 1985 and 1986.

6. In January 1986, an establishment called "Pistol Pete's" requested the City Administration to initiate an amendment to the Ordinance so as to delete the 300 foot locational requirement. This request was denied by the City.

7. As grounds for its appeal, Club Rio argued, *inter alia*, that (1) its business had been in use prior to enactment of the Ordinance and was therefore a preexisting use not subject to the Ordinance, (2) the application of the Ordinance to Club Rio's teen dance operations was unreasonable because the club was permitted to oper-

ate within 300 feet of a residence during its operation as an adult nightclub where alcoholic beverages were served but not allowed to operate as a teen dance hall where liquor was not served, and (3) Club Rio's teen dance hall operation had received favorable reports from the Albuquerque Police Department.

8. At this hearing, the City took a prosecutorial role in attempting to enforce its cease and desist order.

It is undisputed that plaintiffs and the neighbors of Club Rio were not provided notice of this hearing.

Hearing Officer's ruling.[9] Instead, plaintiffs appealed to the Bernalillo County District Court which reversed the Hearing Officer's ruling on November 11, 1987. Club Rio's teen dance operation was ultimately terminated on February 23, 1988.

## II. DISCUSSION

Plaintiffs' complaint alleges violations of the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution, in violation of 42 U.S.C. § 1983. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4).

Specifically, plaintiffs allege in Count I of their Complaint that defendants deprived plaintiffs of their property without due process of law by arbitrarily and capriciously requiring plaintiffs to obtain a permit and comply with the Ordinance while permitting plaintiffs' competitor to operate without a permit and in violation of the ordinance. Plaintiffs further allege in Count II of their Complaint that defendants violated their right to the equal protection of the laws by intentionally and purposefully discriminating against plaintiffs in favor of plaintiffs' competitor by requiring plaintiffs to strictly comply with the Ordinance while allowing Club Rio to operate without a permit and in violation of the ordinance.

### A. Standard For Summary Judgment

Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are intended to " 'secure the just, speedy and inexpensive determination of every action.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1). A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-

moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). Although the material submitted by the parties in support of and in opposition to the motion must be construed liberally in favor of the party opposing the motion, *Harsha v. United States,* 590 F.2d 884, 887 (10th Cir.1979), the burden on the moving party may be discharged by demonstrating the absence of evidence to support the nonmoving party's case. *Celotex, supra* 477 U.S. at 324, 106 S.Ct. at 2553. In such a situation, the moving party is entitled to judgment as a matter of law, "because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 322, 106 S.Ct. at 2552. Summary judgment is warranted even when state of mind is at issue, when the party opposing the motion fails to make the requisite showing to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

### Due Process Claim

At the outset, I note that there are both procedural and substantive aspects to due process. Although plaintiffs do not specifically identify which of their rights under the Due Process Clause have been violated, they do not appear to challenge the procedural adequacy of the city administrative or state proceedings involved in this case. Instead, plaintiff's contentions as to the alleged improprieties surrounding these proceedings appear to be raised as evidence of defendants' arbitrary and capricious conduct in failing to enforce the Ordinance in an even-handed manner. Count I of plain-

---

9. The parties do dispute, however, the City Administration's reasons, if any, for declining to appeal the Hearing Officer's decision.

tiffs' Complaint will therefore be construed as a substantive due process claim.[10]

### 1. Protected Property Interest

Defendants contend they are entitled to summary judgment because plaintiffs have failed to articulate any protected property interest. Specifically, defendants argue that it is undisputed that plaintiffs were never prevented from operating their teen dance facility even though they failed to obtain a permit prior to commencing their operations and had failed to meet all of the conditions required by the Ordinance. Defendants also stress that any property interest plaintiffs may have had was satisfied by the City's ultimate issuance of the required permit.

 In order to prevail on their due process claims, it is well settled that plaintiffs must prove that defendants deprived them of a liberty or property interest protected by the Fourteenth Amendment. *Casias v. City of Raton,* 738 F.2d 392, 394 (10th Cir.1984) (citing *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). As defendants point out, plaintiffs' due process claim must fail unless plaintiffs can show they had a valid property interest protected by the Constitution. *Bishop v. Wood,* 426 U.S. 341, 343, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976); *Roth,* 408 U.S. at 576–77, 92 S.Ct. at 2708–09; *Brady v. Town of Colchester,* 863 F.2d 205, 211–12 (2d Cir.1988). Whether plaintiffs possessed such a property interest must be determined from an independent source such as state law. *Bishop,* 426 U.S. at 343, 96 S.Ct. at 2077; *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. Although "mutually explicit understandings" can be sufficient to create such property rights, *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972), " 'the sufficiency of the claim of entitlement must be decided by reference to state law.' "

*Gunkel v. City of Emporia,* 835 F.2d 1302, 1304 (10th Cir.1987) (quoting *Bishop,* 426 U.S. at 344, 96 S.Ct. at 2077).

 It is undisputed that the City permitted plaintiffs to operate during the entire application process and that plaintiffs were ultimately granted a permit. According to plaintiffs, however, they nonetheless had a protected property interest in the commercial use of their property on an equal basis with others engaged in their type of business. Although plaintiffs fail to refer to any provision of New Mexico law that specifically recognizes this type of property interest, the Tenth Circuit has recognized that under New Mexico law a constitutionally-protected property interest can arise despite the absence of a statute or formal contract. *Casias,* 738 F.2d at 394. New Mexico law in general recognizes a judicial remedy for a property owner aggrieved by a fraudulent, arbitrary or capricious action of a zoning authority. *See, e.g., Downtown Neighborhoods Assoc. v. City of Albuquerque,* 109 N.M. 186, 783 P.2d 962 (N.M.Ct.App.1989) (N.M.Bar Bulletin, Vol. 28, No. 51 at 755 Dec. 21, 1989). Thus, New Mexico law recognizes that the right of a property owner to use his property for a lawful purpose cannot be restricted for arbitrary and discriminatory reasons by governmental zoning actions. In my view, this right, judicially enforceable under state law, is a "legitimate claim of entitlement" that is constitutionally protected from arbitrary deprivation. *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. *See also Wilkerson v. Johnson,* 699 F.2d 325, 328 (6th Cir.1983) ("When governmental institutions regulate careers or occupations in the public interest through the licensing process, their definitions of rights in a license or other statutory entitlement may give rise to *competition rights* and constraints that define *property interests.*") (emphasis add-

---

**10.** Even if plaintiffs do in fact allege violations of their procedural due process rights, it appears that the City provided them with all the process they were due. In challenging the application of the sprinkler requirement, plaintiffs were able to fully avail themselves of an administrative review procedure. Plaintiffs similarly were afforded an opportunity to challenge, both

in an administrative hearing and in state court, the proposed amendment to the 300 foot locational requirement. *See Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (procedural due process satisfied if plaintiff had "the opportunity to be heard at a meaningful time and in a meaningful manner").

ed). Plaintiffs therefore had a protected property interest even though they were ultimately granted a permit.

### 2. Arbitrary and Capricious Conduct

█ A more difficult issue is whether defendants' actions constitute, as plaintiffs contend, arbitrary and capricious conduct sufficient to implicate plaintiffs' substantive due process rights. Although plaintiffs' right to be free from arbitrary or irrational zoning actions is protected by the principle of substantive due process, *Brady*, 863 F.2d at 215 (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 267, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977)) (other citations omitted), I am mindful that I am precluded from sitting as a "zoning board of appeals" in resolving municipal zoning disputes.[11] *See Gunkel*, 835 F.2d at 1305 (citations omitted). Thus, the only question I may consider is whether the action of the zoning commission is arbitrary or irrational, having no substantial relation to the general welfare. *See Wood v. Strickland*, 420 U.S. 308, 326, 95 S.Ct. 992, 1003, 43 L.Ed.2d 214 (1975) (section 1983 "was not intended to be a vehicle for federal-court correction of errors in the exercise of … discretion which do not rise to the level of specific constitutional guarantees").

█ Although the majority of cases in this area involve substantive due process violations based on a municipality's denial of a permit, *see, e.g., Landmark Land Co. of Oklahoma, Inc. v. Buchanan*, 874 F.2d 717 (10th Cir.1989), at least one circuit has upheld the finding of a due process violation even though plaintiffs were ultimately granted a permit. *See Wilkerson*, 699 F.2d at 326. In *Wilkerson*, the plaintiff applied to a state licensing agency for a permit to operate a barber shop. *Id.* at 326–27. Although a license to operate the barber shop was ultimately issued, *see id.* at 327, the

court nevertheless held that defendants' intentional misapplication of state licensing law to keep plaintiff from obtaining an occupational license was conduct sufficient to violate due process. *Id.* at 326. In so holding, the court identified two factors discussed by the Supreme Court in *Hampton v. Mow Sung Wong*, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976) that need to be considered in cases involving governmental interference with the freedom to pursue an occupation. *Id.* at 328. These factors are (1) the nature and seriousness of the infringement and (2) the strength of the justifications given. *Id.* Based on these factors, the court upheld the jury's finding that "the infringement caused by the defendant officials was *harassment and delay* in allowing plaintiffs to pursue their occupation," and that this conduct was the result of the defendants' desire "to deter plaintiffs from opening their shop next to [one of the licensing official's] barber shop." *Id.* (Emphasis added).

In their response to defendants' summary judgment motion, I do not find that plaintiffs have presented the type of direct evidence of political bias that was readily apparent in the *Wilkerson* case. In *Wilkerson*, for example, it was undisputed that one of the defendants operated a barber shop next door to the plaintiffs and was also a member of the state Board of Barber Examiners. *See id.* at 326. The court also found that "the licensing of plaintiffs' barber shop next door would have created direct and significant competition" for this defendant and that "[t]here was testimony that [this defendant] expressed unwillingness to allow a barber shop to open next door to him." *Id.* at 328. Based on this evidence, the court found that the defendant "clearly had the kind of interest in the licensing decision which creates an unconstitutional risk of bias." *Id.*

---

11. As the Eighth Circuit has stated:
 [It is] primarily the province of the municipal body to determine the use and purpose to which property within its boundaries may be devoted, and it is neither the province nor the duty of a federal court to interfere with the discretion with which such bodies are vested,

unless the legislative action of the municipality is shown to significantly invade the … constitutional rights of the complaining party. *Littlefield v. City of Afton*, 785 F.2d 596, 607 (8th Cir.1986) (quoting *Sternaman v. County of McHenry*, 454 F.Supp. 240, 242 (N.D.Ill.1978)).

Nevertheless, I find that plaintiffs here have presented barely sufficient circumstantial evidence of political bias to survive summary judgment. "The regular and impartial administration of public rules ... prohibits the subtle distortions of prejudice and bias as well as gross governmental violations exemplified by bribery and corruption and the punishment of political and economic enemies through the administrative process." *Id.* (citing *Gibson v. Berryhill*, 411 U.S. 564, 578–79, 93 S.Ct. 1689, 1697–98, 36 L.Ed.2d 488 (1973)). Based on a review of the depositions, interrogatories, affidavits, and other exhibits submitted in this case in a light most favorable to plaintiffs, I find that a genuine dispute of material fact has been demonstrated as to whether defendants' conduct towards plaintiffs in their application for a permit under the Ordinance was improperly motivated.

For example, as evidence of defendants' arbitrary and capricious conduct towards them, plaintiffs contend they were required to strictly comply with all of the provisions of the Ordinance while their competitor was, because of political favoritism, allowed to remain open in clear violation of the Ordinance's 300 foot locational requirement. Plaintiffs claim that this political bias manifested itself in essentially four ways: that the City harassed their operation of the Big Apple by unreasonably limiting their occupancy load; threatened them on several occasions with outright closure; unreasonably applied the sprinkler requirement of the Fire Code to their facility; and allowed Club Rio to remain open while the City Administration, at the behest of plaintiffs' competitor, attempted to amend the locational requirement of the Ordinance.

Several undisputed material facts in this case bear repeating. Plaintiffs ultimately were allowed to operate at the same occupancy load their former skating rink was permitted to operate at, were ultimately granted a permit to operate as a dance hall, and, unlike Club Rio, were never actually closed by the City.[12] Moreover, although plaintiffs were ultimately denied a variance from application of the sprinkler requirement, they were granted eighteen months to meet this requirement. Nevertheless, I find that there are sufficient material facts in dispute to make summary judgment on this claim improper.

First, although defendants concede that Graham was a political supporter of defendant Schultz, I find that there exists disputed evidence as to the amount of influence, if any, Schultz brought to bear on various City officials or agencies to attempt to enforce the Ordinance against plaintiffs in an unreasonable or arbitrary manner. I further find that there are disputed facts as to whether the length of time it took for the City to ultimately grant plaintiffs the permit, from May 1985 to September 1986, was reasonable or the result of improper political bias.[13]

■ Finally, although plaintiffs do not challenge the validity of the sprinkler, parking or occupancy load requirements themselves, they do not assert that these requirements were arbitrarily applied to them for improper, politically motivated reasons.[14] For example, plaintiffs' objec-

---

**12.** Like Club Rio, plaintiffs were also allowed to remain open even though they had commenced operation of their teen dance facility before obtaining the necessary permit.

**13.** Because plaintiffs were allowed to continue operating while their permit application was pending, it is possible that plaintiffs may have difficulty determining the amount of damages, if any, they may have incurred as a result of this alleged delay. I nevertheless find that the reasons for any possible delay are material since the amount of damages plaintiffs may be entitled to is a separate issue from whether defendants' conduct was arbitrary or unreasonable and therefore violative of due process. The fact

that plaintiffs were allowed to remain open during this application process may, however, be relevant to any justification or legitimate reasons for the delay defendants may proffer at trial.

**14.** The fact that plaintiffs were given eighteen months to comply with the sprinkler requirement may similarly provide defendants with an argument that it was imposed reasonably and in good faith. Moreover, it may again be difficult to ascertain what damages, if any, plaintiffs may have suffered as a result of the City's imposition of the sprinkler requirement since plaintiffs apparently terminated their teen dance operation before actually installing and therefore

tions to the sprinkler requirement are essentially twofold. First, plaintiffs contend that their teen dance operation is not within the ambit of the plain language of the applicable provision of the City Fire Code. As previously stated, however, it is not within the province of this Court to review the interpretation of a municipal safety ordinance when plaintiffs have had an opportunity to avail themselves of the administrative review process.[15] *See Gunkel,* 835 F.2d at 1305.

What does fall within my review, however, is whether the City's application of the sprinkler requirement to plaintiffs' facility was reasonable or was motivated by political or other arbitrary reasons. While it is true that plaintiffs must produce evidence of improper motive rather than relying upon allegations to defeat defendants' summary judgment motion, *Anderson,* 477 U.S. at 256–57, 106 S.Ct. at 2514, it is also true that " '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge … [when] ruling on a motion for summary judgment….' " *Smith v. Maschner,* 899 F.2d 940, 949 (10th Cir.1990) (quoting *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513). Moreover, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* (quoting *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513). Thus, the circumstantial evidence that has been presented, although far from strong, leads me to conclude that a reasonable jury could find that defendants harassed and unreasonably delayed plaintiffs' attempts to obtain their

permit for arbitrary, politically-biased reasons. I find that summary judgment is therefore improper.

### c. Equal Protection Claim

Based on a review of evidence similar to that which led me to deny summary judgment on plaintiffs' due process claim, I find that the motion for summary judgment on plaintiffs' equal protection claim should also be denied.

As I interpret it, plaintiffs' argument is essentially twofold. First, plaintiffs contend that enforcement of the sprinkler and parking requirements against the Big Apple was discriminatory because the City had not enforced these ordinance provisions against similar types of facilities. Second, that the City's non-enforcement of the Ordinance against Club Rio improperly allowed Club Rio to remain open to the detriment of the Big Apple.[16]

Plaintiffs do not, however, allege that the Ordinance is unconstitutional in that it impermissibly classifies dance hall operations into different categories. Thus, plaintiffs' claim boils down to one of selective or discriminatory enforcement of the Ordinance against the Big Apple and in favor of Club Rio pursuant to a lawful municipal regulation.

 It is well established "that a law fair on its face may be applied so arbitrarily and unfairly as to amount to a violation of constitutional rights." *Cook v. City of Price, Carbon County, Utah,* 566 F.2d 699, 701 (10th Cir.1977) (citing *Yick Wo v. Hopkins,* 118 U.S. 356, 374, 6 S.Ct. 1064, 1073,

incurring the expense of the sprinkler system. *See* n. 13, *supra.*

**15.** In their Response to Defendants' Motion for Summary Judgment, plaintiffs describe the City's interpretation of the sprinkler ordinance as "a tortured reading of the Fire Code." Resp. to Mot. for Summ. Judg. at 3. Plaintiffs interpret the ordinance's requirement that sprinklers "be installed in rooms primarily used for entertaining occupants who are drinking or dining …," as applying only to rooms that are "used primarily for either drinking or dining." *Id.* The evidence shows that plaintiffs maintained a concession stand on the premises where food and drinks were sold. Thus, plaintiffs' dance

facility could arguably fall within the ambit of the sprinkler ordinance. Regardless of whether or not this ordinance was *properly applied to* the Big Apple, I cannot agree that plaintiffs' interpretation of the Fire Code comports with the plain language of the applicable provision requiring installation of an automatic sprinkler system.

**16.** *It is* unclear whether plaintiffs object to defendants allowing Club Rio to remain operating during the entire time the club's permit application was pending or only the six or seven months when the proposed amendment to the locational requirement was being pursued.

30 L.Ed. 220 (1886)). " '[T]he conscious exercise of some selectivity in enforcement,' " however, " 'is not in itself a federal constitutional violation.' " *Id.* (quoting *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962)). To make out a claim of selective enforcement, plaintiffs must show that the selection was based on an impermissible standard such as race, religion, or other arbitrary classification. *Teague v. Alexander*, 662 F.2d 79, 83 (D.C.Cir.1981); *LeClair v. Saunders*, 627 F.2d 606, 611 (2d Cir.1980), *cert. denied*, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981) (quoting *Oyler*, 368 U.S. at 456, 82 S.Ct. at 506).

 Here, plaintiffs have never alleged that they were discriminated against because of their race, nationality, religion, or other improper reasons. Absent such discrimination aimed at a "suspect class," plaintiffs must show intentional or purposeful discrimination. *Cook*, 566 F.2d at 701 (citing *Snowden v. Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944)). Based on my review of the record, I find that there are sufficient disputed material facts as to whether plaintiffs' operation was treated differently from other similarly situated businesses and, if so, whether this different treatment was the result of defendants' intentional or purposeful discrimination. For these reasons, I find that defendants' motion for summary judgment on plaintiffs' equal protection claim should also be denied.[17]

## III. CONCLUSION

For the reasons previously stated, and based on a review of the evidence in a light most favorable to plaintiffs, I find there are genuine issues of material fact so as to preclude summary judgment on both counts of plaintiffs' complaint. Defendants' motion for summary judgment should therefore be denied.

**17.** I do not feel it is proper, however, for plaintiffs to support their equal protection claim based on evidence of the City's favorable treatment of Club Rio unless they can show that any favorable treatment to Club Rio was done with the specific purpose to discriminate against the plaintiffs. *See Scudder v. Town of Greendale,*

IT IS THEREFORE ORDERED that defendants' Motion For Summary Judgment filed December 6, 1989 is denied.

*Indiana,* 704 F.2d 999, 1003 (7th Cir.1983) (showing of unfair and discriminatory conduct must be *purposefully directed toward plaintiffs* to support claim of intentional or purposeful discrimination) (emphasis added) (citations omitted).